## POTTAWATOMIE TRIBE OF INDIANS et al. v. UNITED STATES.
### Appeals Docket No. 5-52.

United States Court of Claims.
April 7, 1953.

O. R. McGuire, Washington, D. C., for appellants. Robert Stone, Topeka, Kan., was on the brief.

Sim T. Carman, Washington, D. C., with whom was Asst. Atty. Gen. James M. McInerney, for the appellees. Leon J. Moran and Donald E. Schwinn, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

This is an appeal from a decision of the Indian Claims Commission dismissing plaintiffs' petition. Although both the Pottawatomie Tribe of Indians and the Prairie Band of the Pottawatomie Tribe of Indians are nominated as appellants in this proceeding, they are in reality one and the same tribe.

In their petition plaintiffs complain of the commutation of the perpetual annuities in the sum of $9,037.90 per year to which they were entitled under a number of trea-

ties with the United States, the cash value of which was paid to the tribe in lieu of the payment of the annuities in perpetuity. Recovery was sought before the Commission of the value of the annuities from January 1, 1910, to the date of judgment, less the sum of $180,758.00, the capitalized value of the annuities paid to the Indians in per capita shares, and less the sum of $35,304.18 credited to the tribe as interest on the principal sum, and also distributed to the tribe in per capita shares during the years 1912 to 1917.

Congress, by the Indian Appropriation Act of April 30, 1908, 35 Stat. 70, 73, authorized the making of agreements with Indian tribes for the commutation of their annuities. The Act provides in part:

"That the Commissioner of Indian Affairs is hereby authorized to send a special Indian agent, or other representative of his office, to visit any Indian tribe for the purpose of negotiating and entering into a written agreement with such tribe for the commutation of the perpetual annuities due under treaty stipulations, to be subject to the approval of Congress; and the Commissioner of Indian Affairs shall transmit to Congress said agreements with such recommendations as he may deem proper." 25 U.S.C.A. § 12.

Pursuant to this Act a special agent was sent to appellant, who secured an agreement consenting to this commutation, signed by what is said to be a majority of the members of the tribe who were over 18 years of age or who were married. This agreement was forwarded to the Commissioner of Indian Affairs, who approved it and forwarded it to the Secretary of the Interior, who approved it and forwarded it to the President, who transmitted it to Congress with the recommendation that it be approved.

Congress, in the Appropriation Act of April 4, 1910, 36 Stat. 269, 289, approved this agreement in the following words:

"Sec. 29. The several agreements concluded with certain Indian tribes hereinafter mentioned, as evidenced by the original papers on file in the office of Indian Affairs and the copies thereof transmitted to Congress by the President and contained in Senate Document Numbered Three hundred and fifty-eight, Sixty-first Congress, second session, for the commutation of their perpetual annuities under treaty stipulations, made in pursuance of a provision of the Act of April thirtieth, nineteen hundred and eight, authorizing the Commissioner of Indian Affairs, subject to the approval of Congress, to negotiate with any Indian tribe for the commutation of perpetual annuities due under treaty stipulations, are hereby ratified and confirmed, to wit:

\* \* \* \* \* \*

"The agreement with the Pottawatomie tribe of Kansas and Wisconsin dated March sixteenth, nineteen hundred and nine; \* \* \*."

In a later paragraph of this section of the Act $180,758 was appropriated for the purpose of carrying out the agreement.

The agreement has been carried out and each member of the tribe has been paid, or there has been set aside for his or her benefit the sum of $236.59, his or her pro rata share of the principal sum, together with interest accruing on the principal fund up to the date of its distribution in 1914.

Appellants question the validity of the agreement, because, they say, a majority of the tribe did not sign the agreement; secondly, they say that defendant's agents misrepresented the Government's proposal to some of the individual members of the tribe, and that their consent thereto was obtained as a result of this misrepresentation; thirdly, they say that some signatures were attached to the agreement without authority; and, lastly, that the agreement was invalid, in any event, because it was not made with the general council of the tribe, but with its individual members.

█ Congress had the right to commute these annuities without the consent of the tribe. Whatever doubt may have theretofore existed about the power of Congress to deal with Indian lands and funds in such way as it thought best for the Indians, even

though at variance with the terms of some prior treaty, was set at rest by the decision of the Supreme Court in Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299. This case has been consistently followed by this court and by the Supreme Court. In it Mr. Justice White, speaking for the court, fully sustained the paramount power of Congress over the property of Indians, even though exercised in conflict with some prior treaty but in a way which Congress thought was for the best interest of the Indians. Among other things, the court said, 187 U.S. at page 566, 23 S.Ct. at page 221:

> "The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians."

██ Although Congress had this power and although it thought it was in the interest of the Indians to commute the annuities to which they were entitled and to make available the cash value thereof, which could be paid to the tribe in a lump sum at such time as the Commissioner of Indian Affairs thought advisable—although of this opinion, it nevertheless preferred to secure the tribe's consent thereto. But when the agreement was secured and ratified by Congress, we think the matter was at an end, in the absence of duress, mistake, fraud, or the like.

Although there may have been irregularities in securing the agreement, we think these were cured by the ratification of the agreement by Congress. When Congress ratified it, it knew the agreement had not been signed on the authority of the general council of the tribe, but by its individual members; it knew that some names had been signed by the Indian Superintendent, pursuant to authority given him in separate instruments, which were attached to the agreement; it knew that some of the signatures had been witnessed by only one man; and it knew that the thumb print of the tribal member had not been affixed to some of the authorizations, as the Indian Commissioner had directed. Having ratified the agreement with knowledge of these irregularities, it must be presumed either to have waived them or to have been of the opinion that the agreement had been secured in the way it intended that it should be secured when it passed the Act of 1908.

There is no doubt that Congress was aware of the way in which the agreement had been secured, because section 29 ratifying the agreements recites, "The several agreements concluded with certain Indian tribes hereinafter mentioned, *as evidenced by the original papers on file in the office of Indian Affairs and the copies thereof transmitted to Congress by the President and contained in Senate Document numbered Three hundred and fifty-eight * * *."* [Italics ours.] It is obvious, therefore, that Congress was fully aware of the nature of the agreements, and had knowledge or means of knowledge of how they had been secured.

It is, of course, true that agreements are ordinarily executed by an Indian tribe on the authority of its general council, and not by the individual members of the tribe. However, this seems to us immaterial in this case, since Congress, by the passage of the Act of April 4, 1910, supra, ratifying the agreement and appropriating the money to carry it out, approved what the Commissioner of Indian Affairs had done in securing the agreement. Congress had the power to commute these annuities, if it thought this was for the best interests of the Indians, without their consent, and, hence, it seems to us immaterial whether or not that consent was obtained in the customary fashion. To say the least, Congress thought that the consent obtained was suffi-

cient to justify it in commuting the annuities.

■ If this view is correct, and we think it is, then it is unnecessary for us to discuss appellants' assertion that the living members of the tribe had no right to cut off future members of the tribe from the benefit of these annuities. The annuities were tribal funds, both parties agree, as of course they must, and Congress has plenary authority over such funds. Whether or not the living individual Indians had the right to cut off future members of the tribe, Congress certainly had the power to do so.

■ It does not follow from what we have said, that the Indian Claims Commission is without authority to treat the agreement as a nullity, if it was obtained by fraud. Congress, by the passage of the Act ratifying the agreement, cannot be said to have ratified the perpetration of a fraud. Section 2(3) of the Indian Claims Commission Act, 60 Stat. 1049, 25 U.S.C.A. § 70a, gives the Commission jurisdiction to hear and determine "claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, * * * mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; * * *." However, the Commission found that there had been no misrepresentation and that fraud had not been practiced in any other way. After a review of the record we think there was substantial evidence to support this finding. Prior to the agreement each member of the tribe had received from the Government $11.00 each year. In 1914 there was paid to each of the enrolled members the sum of $236.59, and thereafter no further annuities were paid, with the exception of disbursements from accrued interest in 1915 and 1917. No protest whatever was made against this for more than twenty years. This lack of any protest is a clear indication that no fraud had been practiced. We are convinced that neither the chiefs nor the members of the tribe thought that the tribe had been defrauded. No mistake or duress is claimed.

We think the conclusion of the Indian Claims Commission was correct, and it is affirmed.

JONES, Chief Judge, and HOWELL, MADDEN and LITTLETON, Judges, concur.