Davis, Judge,
delivered the opinion of the court:
This is an interlocutory appeal by the Yakima Tribe from adverse rulings of the Indian Claims Commission rejecting liability on the part of the United States for certain tracts along the present boundaries of the Yakima Indian Reservation which the appellant says have been wrongfully excluded by the Government from the Reservation. The Tribe also urges that the Commission erred in finding the value of the land which was held to have been improperly taken. The Government has not sought interlocutory review of the rulings rejecting its contentions.
The Yakima Tribe is a confederation of several Indian tribes and bands which lived in what is now the State of Washington. At a treaty council at Walla Walla, Washington Territory, extending from May 28,1855 to June 12,1855, the chiefs of these groups negotiated with representatives of the United States — primarily Governor Isaac I. Stevens of Washington Territory — for the cession to the Federal Government of the lands claimed by these Indians, for the confederation of the various separate units into the Yakima Nation or Tribe, and for the establishment of a defined Reservation in south-central Washington Territory. The Treaty was signed on June 9, 1855, ratified some four years later on March 8, 1859, and proclaimed on April 18, 1859. 12 Stat. 951. The Indians relinquished to the United States (in Article I) a large area of “lands and country occupied and claimed by them.” In return, the Treaty reserved (in Article II) from the ceded area a tract of land within stated boundaries “all which tract shall be set apart, and, so far as necessary, surveyed and marked out, for the exclusive use and benefit of said confederated tribes and bands of Indians, as an Indian reservation.” The Indians were to settle upon this land, which became known as the Yakima Reservation, within one year; “nor shall any white man, excepting those in the employment of the Indian Department, be permitted to reside upon the said reservation without permission of the tribe and the superintendent and agent.”
*676 Thereafter, in the latter half of the 19th century, various surveys were made to establish all or portions of the limits of the Reservation.[1] There was no dispute as to large parts of the boundary, but as to other parts the Indians were dissatisfied with the Federal Government’s initial determinations. In the early part of this century, these controversies were settled, to a substantial extent, by action of the legislative and executive branches with the aid of the courts. See Northern, Pac. Ry. Co. v. United States, supra, footnote 1. There remained, however, a number of disputed segments of the boundary which the Tribe duly presented to the Indian Claims Commission, under Section 2, Clauses 1 and 4, of the Act of August 13, 1946, 60 Stat. 1049, 1050, 25 U.S.C. § 70a, as legal claims for compensation for the unpaid taking by the United States of Yakima Reservation lands. These are areas the Government has considered outside the Reservation and has patented to settlers or granted to others (including the State of Washington) or is maintaining as part of the public domain. To the extent that these areas are actually Reservation lands which have been withheld by the defendant, the Tribe is entitled to recover just compensation. Shoshone Tribe v. United States, 299 U.S. 476 (1937); United States v. Shoshone Tribe, 304 U.S. 111, 115-116 (1938).
The Commission held hearings and adjudicated the claims before us. In its Findings of Fact of May 29, 1953 (as amended on November 6, 1953), and its-opinion of May 29, 1953 (likewise as amended), the Commission, after a trial of the issue of liability, absolved the defendant on three of the four tracts (Tracts A, B, and D), and held for the Tribe on a part of the fourth tract now in dispute (Tract C). Other areas, known as the Cedar Valley land, were also held to have been taken. 2 Ind. Cl. Comm., 444, 481. A further hearing, mainly on valuation of the taken lands, was then had. On November 29, 1957, the Commission amended its findings on liability to some extent, and made additional findings on the value of the lands — part of Tract C and the *677 Cedar Valley land — held to have been wrongfully excluded from the Reservation. 5 Ind. Cl. Comm. 636, 661. However, no final determination of the entire case was made.
The Act of Sept. 8,1960, P.L. 86-722,74 Stat. 829, amended Section 20 (b) of the Indian Claims Commission Act, 60 Stat. 1054, as amended, 25 TT.S.C. § 70s(b), to permit appeals as of right to this court from interlocutory determinations by the Commission establishing the liability of the United States “notwithstanding such determination is not for any reason whatever final as to the amount of recovery.” The parties were given until January 1, 1961 (or, for later rulings, three months after the interlocutory determination) to seek review. The appellant has availed itself of this right to challenge the Commission’s rejection of several of its claims.
The basic text by which to judge the Tribe’s assertion that the Government illegally diminished the Reservation is the Treaty boundary [12 Stat. 951, 952] :
Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickatat and Pisco rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River; thence along said divide to the main Yakama, eight miles below the mouth of the Satass River; and thence up the Yakama River to the place of beginning.
Each of the disputed boundary claims depends upon one or more of these calls, as illuminated by contemporaneous materials, various surveys, maps, topographical and geographical data, and recollections of older Indians. In passing upon the issues we are directed by the Indian Claims Commission Act to uphold the Commission’s findings of fact if they are supported by substantial evidence on the basis of the whole record and to determine whether the conclusions of law are valid and supported by the factual findings. Section 20(b), 25 U.S.C. §70s(b).
*678 TRACTS B AND D
These are two separate areas adjoining the present western and southwestern edges of the Reservation which the Yakimas insist, and the Government denies, should be included within the limits set by the 1855 Treaty. The Treaty runs the northern boundary westward
* * * to the Cascade Mountains; thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickatat and Pisco Rivers; thence down said spur to the divide between the waters of said rivers; * * *
The dispute over Tract B, a pear-shaped area in the northwest, concerns the phrase “thence southerly along the main ridge of said [Cascade] mountains.” In following the main ridge, as the Govermhent conceives it, the present line makes a substantial semi-circular bend to the east before returning to the north-south line which the parties agree forms the rest of the western boundary. The appellant contends that this bend-to-the-east should be eliminated so that the western border will run more or less directly south from the northwest corner of the Reservation and include part of Walupt Lake where, it is said, the Yakimas used to fish.
Tract I) is a large isosceles triangle based on the present southwest boundary (which is a straight line running southeasterly from the terminal point of the western boundary — a point east of Mt. Adams in the Cascade range — to the point of the beginning of the southern boundary (Grayback Mountain) ). The pertinent Treaty calls are the latter two quoted above, referring to the “spur whence flows the waters of the Klickatat and Pisco Rivers” and to the “divide between the waters of said rivers.” The Tribe asserts that the present straight-line southwestern boundary departs from these requirements and cuts the Yakimas off from substantial territory rightfully theirs.
We do not reach the merits of the claims to either Tract B or Tract D because the Indian Claims Commission, as we read its opinion and findings, erred in holding itself compelled by the decision of the Supreme Court in Northern Pacific Ry. Co. v. United States, supra, 227 U.S. 355 (1913), *679 to reject the appellant’s claims as a matter of law and without regard to the materials and arguments presented in this proceeding.
Northern Pacific was a suit by the Federal Government to cancel land patents on the ground that they were issued under the mistaken belief that the areas were public lands available to the railroad under its land-grant statute of 1864 whereas the lands were actually part of the Yakima Reservation established in 1855. The controversy arose out of two differing surveys of the western limits of the Reservation. The Schwartz survey of 1890-1891 put the boundary considerably to the east, and the Interior Department then patented lands west of the Schwartz line to the railroad. At the insistence of the Indians, a new survey was ordered, and Barnard, the new surveyor, placed the western boundary (in 1898-1899) much further to the west, along the line of the present western and southwestern borders. Congress accepted the Barnard survey by the Act of December 21,1904, 33 Stat. 595, and in 1907 the Federal Government sued the railroad and its vendees to compel return of the lands west of the Schwartz line.
The Circuit Court accepted the Barnard survey and decreed cancellation of the patents. The Court of Appeals for the Ninth Circuit affirmed (191 Fed. 947 (1911)), as did the Supreme Court (227 U.S. 355). The Supreme Court’s opinion poses the issue as “which of the surveys, Schwartz’ or Barnard’s, correctly marks the boundaries of the reservation” (227 U.S. at 358) and says that the “special controversy in the case is the location of the western boundary” (227 U.S. at 359). The opinion not only endorses Barnard’s survey as a whole but also indicates that the Court considered (i) the “main ridge” of the Cascades to be where the Government now says it is (so as to exclude appellant’s Tract B) and (ii) the southwestern limit to be a straight line from a point east of Mt. Adams to Grayback Mountain (so as to exclude Tract D). Because of these statements, the Indian Claims Commission viewed the Supreme Court’s opinion as having “judicially settled” (in 1913) the western and southwestern boundary lines contrary to appellant’s present claims, and as having “determined” the boundary to be where the ap- *680 pellee says it is. The Commission’s opinion is quite clear that it felt itself wholly bound by the Supreme Court’s decision and did not in any way attempt to resolve the issues for itself. The Commission’s findings of fact are less explicit but we agree with the appellee that they do not represent independent findings based on the materials before the Commission but, rather, simple reiterations of the Supreme Court’s conclusions.[2]
This unquestioning submission to the Supreme Court’s opinion as controlling the present case was unwarranted. The principles of res judicata, collateral estoppel, adherence to precedent, and obedience to the rulings of higher courts do not — separately or together — deprive the Commission of all authority to make its own determinations as to Tracts B and D. Of course, due regard should be had for the particular views expressed by the Supreme Court in Northern Pacific, as well as for the general rules of construction it declared for the 1855 Treaty. But that case is not this, and it did not decide this case. The Commission’s function here is not merely ministerial, as it appeared to believe.
Bes judicata and collateral estoppel do not apply because the parties as well as the lands in suit are different. The area disputed by the Government and the Northern Pacific lay between the Schwartz and Barnard lines — i.e., within the present boundaries of the Beservation — and no issue was presented for decision (nor need it have been) as to the lands, beyond the Barnard line, embraced in Tracts B and D. In upholding the Government over the railroad, the Supreme Court did make observations which would, if taken at full value, preclude the appellant from recovering in this proceeding, but the causes of action are quite distinct and the Court did not decide the questions now mooted nor was it required to do so in order to dispose of the Northern Pacific litigation. In that case, moreover, the Yakima Tribe was not a party adverse to the United States; the railroad and *681 its grantees had that position. True, the representation of the Tribe by the Government would serve to bind the Yakimas, as against the Northern Pacific, as to all issues actually decided or forming part of the cause of action (e.g., Heckman v. United States, 224 U.S. 413, 444-446 (1912)); but as between the United States and the Tribe there would be no prior adjudication, binding in the present suit, even as to such questions. See A.L.I., Restatement of the Law of Judgments, sec. 80 (“Representative Capacity—Persons Acting as Fiduciaries”), esp., pp. 374-5, and sec. 82 (“Non-Adversary Parties”). “What was said by the judge in the course of his opinion may be significant as a precedent; it is ineffective as a bar.” Hill v. United States ex rel. Wampler, 298 U.S. 460, 467 (1936).
Nor was the Commission bound to follow the statements in the Northern Pacific opinion simply because they were made by the Supreme Court. That might well have been the Commission’s duty — putting aside any effect the Indian Claims Commission Act might have to permit the reopening of matters otherwise settled — if the highest court’s earlier pronouncements had been on pure issues of law. But for the purposes of adherence to the Anglo-American doctrine of precedent we do not regard the Court’s discussion of the meaning of the particular boundary calls of the 1855 Treaty as of that character. In a general sense, the construction of Indian treaties raises “legal” rather than “factual” questions (cf. Chootaw Nation v. United States, 318 U.S. 423 (1943); Tulee v. Washington, 315 U.S. 681 (1942); United States v. Shoshone Tribe, 304 U.S. 111 (1938)), but a distinction should be made for individualized boundary calls which have to be read in the light of varying surveys, personal and tribal recollections, and comparable individualized materials. Resolution of those problems depends so much on the particular information before the tribunal, at the time it decides the case, that the process of adjudication is in many ways closer to a determination of fact than to a legal ruling. The Northern Pacific opinions of the Supreme Court and the Court of Appeals reflect great reliance on that type of particularized materials. But new materials may be discovered or new surveys made. In the present proceeding, for *682 instance, the appellant places stress on a map of the Yakima Eeservation made by Governor Stevens three days after the Treaty was signed, which was not before the courts in the Northern Pacific litigation because it was lost sometime in the 19th century and was not found by the Interior Department until 1930. It would disserve the larger purposes of the principle which requires inferior tribunals to follow the higher courts to demand unquestioning acceptance of everything said in Northern Pacific, despite the proffer of significant new information. Cf. Perkins v. Endicott Johnson Corp., 128 F. 2d 208, 217-218 (C.A. 2, 1942), affirmed, 317 U.S. 501 (1943).
In addition, as we have already indicated, we are more firmly persuaded that the Commission should not have taken the Supreme Court’s opinion in Northern Pacific, as establishing a legal ruling, to be followed automatically, because the mind of that Court was obviously not directed to the special problems the Commission was required to solve in this case. The areas beyond the Barnard line (i.e., outside of the present boundaries) were not then of concern to the Court; its attention was turned the other way.[3]
For these reasons we hold that the Commission was incorrect in resting, as to Tracts B and D, solely upon the opinion of the Supreme Court in Northern Paeifie. The parties have both presented elaborate arguments on the merits of these claims, but we shall not undertake to decide them at this stage and intimate no views whatever. The Indian Claims Commission Act (Sec. 20(b), 60 Stat. 1054, as amended, 25 U.S.C. § 70s(b)) empowers the court to remand the cause “at any time” to the Commission for further proceedings, and here that is clearly the preferable course. Appellant’s proceeding is still pending before the Commission and no final determination has been made. That tribunal is in a better position to canvass, in the first instance, the specialized materials, old and new, which the parties offer, and to decide, with due regard for the opinions in Northern Pacific, *683 whether any or all of Tracts B and D rightfully formed part of the Yakima Reservation under the 1855 Treaty.
TRACT A
Tract A lies just beyond the present eastern edge of the Reservation and invokes the calls of the Treaty which refer to “the divide separating the waters of the Satass [now Satus] River and those flowing into the Columbia River; thence along said divide to the main Yakama, eight miles below the mouth of the Satass River” (12 Stat. 952).
The eastern boundary of the Reservation now follows the line set in 1885 by surveyor Clarke, attempting to apply these Treaty provisions. The line turns south from the Yakima River at the corner of fractional sections 25 and 30 between Ranges 22 and 23 (which Clarke considered to be roughly 8 miles from the junction of the Satus with the Yakima), and near the small town of Mabton runs southwesterly in a straight line to the Horse Heaven Hills where it turns west along the ridge until it meets Grayback Mountain. The claimant asserts that the line should not turn south from the Yakima (which runs in a southeasterly direction) until a point about two miles beyond Mabton and should join the Horse Heaven Hills to the east of the present meeting point. The disputed area enclosed by appellant’s proposed line is now inhabited by settlers.
The eastern calls of the Treaty raise a complex of problems, large and small. As with the western limits with which the Supreme Court dealt in the Northern Pacific case, “there is confusion in the calls, irreconcilability, it may be from some points of view”, 227 U.S. at 362. The geography and topography of the area, as we know it today and can reconstruct it for the past, is difficult if not impossible to fit with the words of the Treaty.
A major puzzle is the location of the “divide separating the waters of the Satass [Satus] River and those flowing into the Columbia River”, along which “divide” the boundary is to run to the Yakima. If this call is taken literally to refer to a true divide directly between the Satus and the Columbia (a river which is located considerably to the south) — as distinguished from a divide between the Satus and Yakima — it *684 cannot be applied in the eastern portion of the Reservation because there is no such direct separation. If the call means a divide between the Yakima and the Columbia, then the Reservation would extend far to the east into an area the Indians have never sought and do not now claim. On the other hand, if the “divide” is between the Satus and the Yakima (as a tributary of the Columbia), it is not easy to discover a well-defined line which the Indians would clearly have recognized in 1855 as a “divide.”
The declaration that the boundary joins the Yakima “eight miles below the mouth of the Satass River” creates further problems. First, there is serious dispute as to the location of the mouth of the Satus River in 1855. Second, since the Yakima meanders extensively in that region there is the question whether the “eight miles” should be measured along the curvature of the meanders or in the general southeasterly direction of the river. Third, how precisely is the “eight miles” distance to be taken? Fourth is the difficulty that, on any rational answer to the foregoing three questions, it is still hard to find a “divide” meeting the Yakima at the point indicated by the Treaty.
The Indian Claims Commission cut this interconnected series of Gordian knots by first deciding that (a) it could not accurately determine from the evidence the location of the mouth of the Satus in 1855; and (b) it would subordinate the “eight mile” requirement, if necessary, because distances in terms of miles “were beyond the cultural attainments” of the Yakimas in 1855. Then the Commission decided that the dominant intent of this portion of the Treaty was to include within the Reservation all the land between the Yakima and the Horse Heaven Hills draining into the Satus, and that the line separating the Satus watershed from areas draining into other streams should be considered the “divide” to which the Treaty refers.[4] The result was that the Commission’s eastern line from the Yakima River in the north to the Horse Heaven Hills on south, along the easternmost rim of the Satus watershed, was somewhat to the west of (and therefore within) the present boundary of the Reservation. No *685 part of Tract A was included. Accordingly, the appellant was held to have no right to recover for that tract but rather to be occupying (with the acquiescence and approval of the Federal Government) an area greater than initially called for by the Treaty.
We see no sufficient reason to override the Commission’s solution. It has its difficulties, of course, hut they are less (and certainly no greater) than those presented by appellant’s position; and giving due weight to the Commission’s factual findings (which are supported by substantial evidence) we cannot say that appellant has shown any legal error in interpretation of the Treaty or application of its provisions.
Appellant’s primary challenge is to the Commission’s refusal to find the mouth of the Satus, in 1855, to have been at the spot the Tribe says it was located by surveyors Berry and Lodge in 1861.[5] This is an issue of fact on which we are required by the statute to uphold the Commission if its findings are supported by substantial evidence on the record as a whole. See Snake or Piute Indians v. United States, 125 Ct. Cl. 241, 246 ff, 112 F. Supp. 543, 546 ff. The Commission found that “there is no convincing evidence of the location of the point that Berry and Lodge considered to be the appropriate starting point for the survey of the southern boundary of the reservation. The most satisfactory determination of the initial point on the Yakima Fiver for the southern boundary of the Yakima Eeservation was made by Surveyor Harry A. Clarke in 1885”. Finding 11, 2 Ind. Cl. Comm. 487. Despite appellant’s detailed and elaborate attack, we cannot say that this finding is inadequately supported. The Commission had before it conflicting opinion evidence as to the place of the Berry-Lodge point, which those surveyors’ own notes, survey, and markings left most *686 uncertain. It had also the later, more definite, surveys of 1874 and 1885 indicating that the mouth of the Satus was further upstream, and though it was not improbable that the stream had changed its channel more than once,[6] the Commission was free to conclude that the evidence established no more than that the Satus channel “was in a state of flux” (2 Ind. Cl. Comm. 455) and that there was nothing in the record on which to base a definite finding as to the location of the mouth in 1855.
Those determinations of fact must be accepted on this record, and with their acceptance falls the entire structure upon which appellant has built its demand for Tract A (see footnote 5, supra). That claim rests wholly on placing the mouth of the Satus in 1855 at the Berry-Lodge point on the Yakima Biver and then measuring eight miles to the southeast in the general direction of the Biver. We shall also point out, in discussing the Commission’s holding, that in other respects appellant’s proposal is an unsatisfactory application of the Treaty calls — or at most no more satisfactory than the Commission’s.
As we have noted, the Commission pitched its ultimate conclusion as to the proper boundary on the basis that the main purpose of this segment of the Treaty was to include the Satus watershed within the Beservation. This is a reasonable interpretation, consonant with the phrasing of the Treaty which speaks of “separating the waters of the Satass Biver”, so as to suggest that those waters, and not others, are to be within the reserved area. The appellant answers, however, that this position (i) disregards the call for a “divide”— which appellant reads as a well-defined ridge, spur, or immediately identifiable separation — ¡because the easternmost rim of the Satus watershed (which the Commission’s line follows) is not a well-defined natural object; and (ii) also takes no account of the separation demanded by the Treaty between the waters of the Satus and those flowing into the Columbia.
The Commission’s “divide”, it is true, does not fit the concept of a prominent spur or ridge separating watersheds; and the Indians in 1855 may have had that notion of a di *687 vide. But (as this record shows) topographically a divide is no more than a boundary between one drainage and another — which need not be individually prominent or well-defined and may even appear almost level. See 23 Encyclopedia Britannica (1957), p. 430, “Watershed”; Anderson v. Henderson, 124 Ill. 164, 16 N.E. 232 (1888). It would not contravene the bare words of the calls to treat the Commission’s line as a “divide”; and such an interpretation does conform, as the Commission pointed out, to the objective of the Treaty to enclose the Satus waters. To this must be added the significant (and admitted) fact that no well-defined ridge or spur or prominence can be found, within any reasonable distance of the present eastern end of the Reservation, to meet the Treaty requirement of a “divide.” The line appellant claims as the eastern boundary (running south from the Yakima River to the Horse Heaven Hills) is plainly not such; it does not purport to follow a sharp or well-defined topographical feature. Like the Commission’s line (further west), the Tribe’s proffered boundary simply goes from a point on the Yakima to another on the Hills without crossing drainage; the difference between the Commission’s line and the Tribe’s is not in topography but solely in the point at which the line begins to run south — the appellant’s commences some distance east on the Yakima. The only prominent feature in the region which could conceivably satisfy a requirement for an immediately observable “divide” is the ridge of the Horse Heaven Hills which extends far to the east and strikes the Yakima River some 20 miles beyond the present boundary. The Tribe has never claimed that to be the boundary, and does not claim it now; indeed, appellant’s brief implicitly recognizes that it Would be unreasonable to do so, in the light of a century’s history.[7] Faced with these physical and historical facts, the Commission did not err in applying the Treaty term “divide” to the outer limits of the Satus watershed even though they are not sharply defined or prominent spurs or ridges.
*688 Similarly, there was no error in reading the calls to require separation, at this point, of the Satus waters from those flowing into the Yakima (rather than from the Columbia waters, as a whole). Geography and topography will not permit any other resolution. In this area there can be no separation of “the waters of the Satass River and those flowing into the Columbia River” unless the latter category is equated to the other waters flowing into the Yakima, — an equation which it is quite proper to assume because the Yakima does ultimately flow into the Columbia. Since the main purpose was to include the Satus watershed within the Reservation it is reasonable to infer that the Treaty nego-iators meant to exclude other waters (which they broadly, but qorrectly, characterized as flowing into the Columbia River) .[8]
Appellant, finally, makes the point that the Commission’s line does not join the Yakima eight miles below the mouth of the Satus. The Commission thought there was near-enough satisfaction of that provision (see footnote 4, supra), especially in view of the rejection of the downstream point (the Berry-Lodge survey) urged by the claimant as the mouth of the Satus in 1855, and the holding that Clarke’s 1885 fixing of the Satus mouth was the most satisfactory starting point that can be used today.[9] We do not disagree with the Commission. The subordination of the “eight miles” factor accords with the established rule that calls for *689 natural objects control over calls for distance. United States v. State Investment Co., 264 U.S. 206, 211-212 (1924), and cases cited; Creek Nation v. United States, 93 Ct. Cl. 561, 569 (1941). Moreover, appellant correctly recognizes that the reference to “eight miles below the month of the Satass Eiver” is not in itself a call but merely a description of the point at which the “divide” joins the main Yakima. As the Commission said, the Indians would not, in 1855, place much reliance on a description in terms of miles. Their concern would be directed to natural objects and to such goals as the inclusion of a full watershed in the reserved area.[10]
Our conclusion, as to Tract A, is that the Commission’s findings of fact are adequately supported, that its interpretation of the inconsistent Treaty calls is correct in the light of the findings and of the topography of the area, and that it did not misapply the general principles governing Indian boundary treaty claims to the particular physical and textual problems before it. In the absence of clear physical marks, the Commission’s stress upon inclusion of the Satus watershed as the dominant theme of the eastern calls was apt. From that theme the finale evolved harmoniously.
TRACT C
This area, which adjoins the western portion of the present northern boundary of the Reservation, involves the Treaty’s northern boundary calls: “Commencing on the Yakama Eiver, at the mouth of the Attah-nam [now Ahtanum] Eiver; thence westerly along said Attah-nam Eiver to the forks; thence along the southern tributary to the Cascade Mountains” (12 Stat. 952). The Commission held the defendant *690 liable for excluding a substantial part of Tract C from the Beservation. The Tribe appeals from the rejection of its claim to the remainder.
The dispute as it reaches us turns on (a) the location of “the forks” mentioned in the Treaty (the parties offering different stream-junctions as meeting that specification) ; (b) the designation of the “southern tributary” which the boundary follows (different streams being selected by the parties); and (c) the proper way to run the line along that southern tributary “to the Cascade Mountains.” The record consists of the testimony of technical witnesses presented by both sides, a number of maps, prior written reports of engineers and surveyors who gave evidence, and some contemporaneous accounts relating to the negotiators’ knowledge of the area.
Going west along the Ahtanum Biver the first fork one encounters is that at Tampico between (what is now called) the South Fork and the North Fork of the Ahtanum. The present boundary considers this the Treaty forks and proceeds along the South Fork as the “southern tributary.” The Commission agrees.[11] Appellant, however, asserts that the Tampico junction is not the Treaty “forks” but rather that the boundary passes that point and runs up the North Fork, as the continuation of the main Ahtanum, to the spot where Nasty Creek joins the North Fork — and there, it is said, is “the forks”, the North Fork being the “southern tributary” which becomes the boundary at that junction.
We need not decide whether the Commission’s determination that the meeting of streams at Tampico is “the forks” and therefore that the South Fork is the “southern tributary” is wholly or partially a finding of fact, or essentially a legal ruling subject to plenary review, because we concur, on an independent consideration of the opposing contentions, with the Commission’s holdings. Although the answer is not *691 absolutely clear and there is much to be said on appellant’s side, the balance does swing decisively, in our view, against the Tribe.
The Treaty speaks of “the” forks met when one proceeds westerly along the Ahtanum from its mouth. This suggests a prominent junction, and most likely the first one reached going west. The forks at Tampico are admittedly the first; they are also the principal forks of the entire Ahtanum system. The two valleys and the forks are well-defined and easily observable, the North Fork flowing in a narrow “V”shaped valley and the South Fork in a broader “U”-shaped valley. This set of forks was undoubtedly well-known to the Indians in 1855 and was probably also known to the government negotiators (some of whom were nearby shortly before the Treaty negotiations). In addition, the South Fork fits the call for “the southern tributary” which becomes the boundary at “the forks.” A tributary is a feeder stream— and that is what the South Fork can well be considered if the North Fork, which has always had a considerably greater flow, is viewed as the continuation of the main Ahtanum. The South Fork is also the most southerly of all the Ahtanum tributaries.
It is much harder to support the junction of Nasty Creek with the North Fork as “the [Treaty] forks”, or to choose the North Fork as “the southern tributary” (as appellant would do). That reading would disregard, without a satisfactory explanation, the first prominent set of forks (at Tampico) in order to select a much less prominent junction, and would also require changing direction from westerly (as the Treaty puts it) to northerly before reaching “the” forks. Nasty Creek is short and relatively unimportant and at times becomes dry; it is difficult to conceive of it as the principal Ahtanum or of the much larger North Fork as its “tributary.” Appellant argues that boundaries are most often located along main streams such as the North Fork, but the 1855 Treaty expressly puts the boundary along “the southern tributary” of the Ahtanum and not the main river. This phrasing cannot be avoided simply because it may be more usual to select the primary stream. See Choctaw Nation v. *692 United States, 318 U.S. 423, 432 (1943); Shoshone Indians v. United States, 324 U.S. 335, 353 (1945).
Tbe Tribe relies heavily on early maps of the area which it says show the boundary line as running along the North Fork and “the forks” as located at the Nasty Creek junction. One is a sketch map of the Reservation, dated June 12,1855 (three days after the making of the Treaty), and signed by Governor Stevens, the principal negotiator for the United States. This sketch was transmitted by Stevens with the Treaty but became misplaced and was not found again until 1930. Another sketch is the so-called White Swan map, made in March 1857 but not considered very reliable. From these maps (primarily the former) appellant makes certain deductions and interpretations to sustain its claim. The Commission, on the other hand, uses the 1855 map as strong support for its own position. Since the maps are but imprecise sketches with scanty nomenclature and markings,[12] they do not provide certain guidance. But to us the Commission has the better of the debate on the 1855 map — which clearly indicates that the boundary does not follow the main Ahtanum but a southerly tributary. The North Fork, rather than Nasty Creek (feeding it from the north), must have been considered the main river (which the boundary did not follow); in addition to the great disparity in the flow and importance of the two streams is the fact that the course of Nasty Creek does not conform at all to the location on the 1855 map of the stream which appellant now designates as Nasty Creek. On the other hand, the Tampico forks could well be the unnamed junction marked on the sketch. Also, the map shows the boundary stream (“the southern tributary”) with a separate headwater fork near the 121st meridian; the South Fork rises and joins its own tributary, Reservation Creek, in that area. There are other significant points of consistency between the map and the Commission’s view — and of inconsistency with appellant’s.
The last contention is that use of the South Fork of the Ahtanum River as the boundary (beyond “the forks” at *693 Tampico) does not bring tbe line “to the Cascade Mountains” (in the words of the Treaty) since that stream stops considerably short of the mountains (see footnote 11, supra) while the North Fork flows much closer. This is perhaps appellant’s strongest point but it cannot outweigh all the other factors. Neither the South nor the North Fork extends to the mountains; whichever is chosen, a land line must connect the water boundary with the Cascades (see Northern Pacific Ry. Co. v. United States, supra, 227 U.S. at 362).[13] The treaty makers may have thought that the river chosen as the boundary did extend all the way to the mountains, but there is considerable reason (including the 1855 sketch) to believe that they pictured the South Fork, rather than the North Fork, in that way. At the least, there is no adequate ground to assume that they knew that the North Fork actually came closer than the South Fork. Their ignorance of the topography is understandable but it does not control the outcome of the claim.
VALUATION AND ACREAGE
In its ruling of November 29,1957, the Commission determined the value of two tracts which it had previously held had been taken — the Cedar Valley lands and part of appellant’s Tract C[14] — in an amount greater than the Government admitted but considerably less than appellant urged.[15] This appeal attacks those valuations, and as to Tract C also challenges the method of measuring the quantity of land for which compensation is to be paid. These are factual issues and the Commission’s rulings are conclusive if sustained by adequate findings and substantial evidence on the record as a whole, and if the principles of valuation followed by the Commission are correct; due account is also to be taken “of the rule of prejudicial error.” Sections 19 and 20 (b) of the *694 Indian Claims Commission Act, 60 Stat. 1054, as amended, 25 U.S.C. 70r and 70s(b); Miami Tribe of Oklahoma v. United States, 146 Ct. Cl. 421, 447-448, 469, 175 F. Supp. 926, 941-42, 954 (1959). We are not at liberty to make our own independent appraisal of the evidence. United States v. Seminole Nation, 146 Ct. Cl. 171, 180, 173 F. Supp. 784, 790 (1959); Kiowa, Commanche and Apache Tribes v. United States, 143 Ct. Cl. 534, 542-43, 163 F. Supp. 603, 609 (1958).
A. Cedar Valley lands: The Act of December 21, 1904, 33 Stat. 595, which validated the Barnard as against the Schwartz survey (see the discussion of Tracts B and D, supra), likewise confirmed rights which had earlier been granted in the disputed area (i.e., within the Barnard survey) to settlers (see Northern Pac. Ry. Co. v. United States, supra, 227 U.S. at 358); patents were issued to such persons in the Cedar Valley area. The Commission held in 1953 that the Yakimas had been wrongfully deprived of the 27,647.71 acres thus excluded from the southwest part of the present Beservation and were entitled to just compensation. The 1957 award measured this compensation. It is agreed that value is to be determined as of December 21,1904 (the date of the Congressional enactment) and that the highest and best use of the land was for timber, or as timberland with limited grazing value; it was without agricultural, mineral, scenic, wildlife or recreational values at that time. The Valley was covered with a stand of timber of which 80 to 85% was Ponderosa pine and the balance was Douglas fir, larch, spruce, and the like.
Before the Commission and here, appellant has relied mainly on its appraiser (Henze) who was of the opinion that the lands were worth $30 per acre in 1904 because of their standing timber. Appellee’s appraiser (Miller) gave a nominal value of $.50 per acre, principally because of the difficulty in 1904 of logging the timber.
The Commission found $2.50 per acre. Its findings are extensive and detailed, taking account of a multitude of factors bearing on market value in December 1904. These elements include the geography of the Beservation, in general, and of Cedar Valley, in particular; the history of the settlement of the general area and of the Beservation, including *695 Cedar Valley; commercial lumbering and other economic activities in the region; the topography, weather, and geography of the Valley; its vegetation, including timber; travel and transportation to and within, and communications with, the Valley; sales of Valley land from 1902 on; comparable sales of neighboring lands and stumpage sales of timber; valuation of standing timber for other purposes; ultimate use of the Cedar Valley lands for logging; and the valuation testimony of the two expert witnesses. The Commission’s opinion scans that spectrum of facts and factors, basing its ultimate figure of $2.50 per acre primarily on the inaccessibility of Cedar Valley in 1904; the easier availability of other plentiful timberlands for logging; the difficulty of conducting commercial logging operations and the lack of interest by commercial operators in that area at the time; comparable sales of timberlands during that period in the general vicinity; and the availability of timberlands under the public land laws at $2.50 per acre (not to exceed 160 acres). 5 Ind. Cl. Comm. 639*-660.
Appellant launches a full-scale assault on the Commission’s findings, reasoning, and conclusion, but neither the attempt to sap the individual findings nor the general attack convinces us that there is an absence of substantial evidence to support the findings, or an omission of necessary findings,[16] or any significant departure from the applicable principles of valuation. The fundamental difference between the Commission and appellant is that the latter bears down heavily on the large amount of usable standing timber in the region but touches only lightly on the difficulties in 1904 of realizing on that timber, while the Commission discounts the importance of the standing timber to the 1904 value of the land because of the formidable obstacles at that time to commercial logging in the area.
*696 It is plain that the Commission correctly viewed the problem as the valuation of the property as a whole, not as one of separately appraising and cumulating various individual elements such as the different kinds of timber, the value of the bare land, the improvements (if any). United States v. Meyer, 113 F. 2d 387, 397 (C.A. 7, 1940), cert. denied, 311 U.S. 706 (1940); United States v. Jaramillo, 190 F. 2d 300, 302 (C.A. 10, 1951); Morton Butler Timber Co. v. United States, 91 F. 2d 884, 888 (C.A. 6, 1937); United States v. Certain Parcels of Land, 149 F. 2d 81, 82 (C.A. 5, 1945). There was no error in this general approach. On that premise, we cannot say that the Commission’s balancing of the pertinent factors, and its evaluation of the land as a whole, lacks adequate support in this record or that the Commission was barred from making the choice it did. In 1904, the Cedar Valley land was very isolated, separated from all other areas of settlement by much virgin timberland closer to the timber mills and markets; very few people lived there (at the time or later) and the means of access and communication were and remained poor; logging prospects were forbidding and commercial logging operations in the area were not in fact commenced until 1952 (and then as part of the logging of a large area requiring very substantial expenditures for access roads, etc.). Of the two counties in which the Cedar Valley lands are located, Yakima and Klickitat,[17] there were no stumpage sales of timber in the former before 1913 and in the latter before 1918 — even from the more available parts. Until 1926 all timberland sales in Klickitat County were from the much more readily accessible areas.
This history supports a finding that the contribution of the standing timber to the value of the land in 190J¡. should be strongly discounted. In a not dissimilar case, involving a tribe located in Oregon, this court said (Warm Springs Tribe of Indianas v. United States, 103 Ct. Cl. 741, 745 (1945)): “When it was taken, this timber had no present value, but only a speculative one, because there was no railroad or other means of transporting the logs or lumber from the tract, and because there were millions of acres of *697 similar undeveloped timber lands in. this vicinity and in other mountainous sections on the West Coast.” See also Chippewa Indians of Minnesota v. United States, 87 Ct. Cl. 1, 35-87 (1938), aff'd, 305 U.S. 479 (1939); Sioux Tribe of Indians v. United States, 146 F. Supp. 229, 238 (Ct. Cl., 1956).[18]
The actual sales of comparable land bear out this conclusion. From 1902 to 1914, sales of Cedar Valley land, improved and better located, brought from $3,125 per acre to $12.50 per acre; but the nearest outside unimproved tract to change hands about December 21,1904, brought only $1.00 per acre (in 1906). A large number of sales of neighboring lands up to 1904 brought, on the average, $4.08 per acre, but these areas were closer to transportation or easier to log and many (if not most) were improved. In 1904, settlers applying under the Timber and Stone Act of 1878, 20 Stat. 89, could normally obtain up to 160 acres of vacant timberland for $2.50 per acre. See Warm Springs Tribe of Indians v. United States, supra, 103 Ct. Cl. at 745.
As against this type of evidence on which the Commission rested its ultimate finding, appellant’s proof that relatively high values were placed on the standing timber in the general area by the Government and others — some valuations were for tax and like purposes, and some were considerably later than 1904 — cannot prevail as a matter of law. For the most part, these overall valuations did not differentiate between timber which was reasonably available for commercial development and likely to be so used, and that which was poorly located or inaccessible. In addition, appellant’s experts relied on distant sales of land not shown to be comparable to the Cedar Valley tracts. The Commission was not compelled to accept these general indices of land value over the more specific showing that Cedar Valley land, despite its stand of timber, would not bring high prices in 1904. See Olson v. United States, 292 U.S. 246, 257 (1934).
*698 B. Tract G lands: There are three problems as to the portion of Tract C held to have been taken. The Commission did not err in solving any of the three.
1. Appellant claims that 425.32 acres were erroneously excluded from the total Tract C acreage for which compensation was to be awarded. These 425.32 acres are unpatented land in the portion of Tract C within the corrected boundary (see the discussion of Tract C, supra). The Commission held that these acres were still available to the Tribe, that it had not lost its title, and that it should therefore not be paid for them. Since the land has not been disposed of or set apart by the Government (through patenting it to settlers or otherwise) , appellant is not entitled to an award of just compensation. The erroneous drawing of the Reservation boundary so as to exclude these lands did not constitute a taking. United States v. Creek Nation, 295 U.S. 103, 111 (1935).
2. There is also a dispute as to the total acreage in Tract C for which appellant should receive an award. The Commission computed it at 17,.699.10 acres (excluding the 425.32 acres considered immediately above) while the Tribe claims over 20,000 acres. The difference turns on (a) the location of the South Fork of the Ahtanum River, and (b) the proper maps and measurements to use in computing the area once its boundaries have been defined. These are basically factual questions on which the Commission’s rulings have adequate support and must therefore be accepted.
3. The third issue is the valuation of the Tract C land. The agreed valuation date is 1923, the average date when patents to others were issued. See Creek Nation v. United States, 302 U.S. 620, 622 (1938). The land is mountainous virgin timberland with a light ragged stand of timber, mainly non-commercial in character. In 1923 it was barren of all modern means of access and communication. The Commission, finding that the best use was summer grazing (during July, August, and September) in conjunction with other land, concluded the fair market value to have been $1.25 per acre. Appellant’s appraiser valued it at $6.00 per acre (relying, again, largely on his computation of the board feet of timber), and appellee’s put it at $1.00 per acre. As with the Cedar Valley lands, the Commission’s findings (5 *699 Ind. Cl. Comm. 656-660) are adequately detailed and sufficiently supported by substantial evidence. It could properly determine that the area was not usable or valuable in 1923 for timber, and that on the basis of comparable sales, capitalization of highest rentals produced, and valuation for tax purposes, the value for short-term grazing, the then highest use, did not exceed $1.25 per acre.
The result of our consideration is that on all issues, except those relating to Tracts B and D, the determinations of the Indian Claims Commission are affirmed. On the issues involving Tracts B and D, the determination of the Commission is reversed and the case is remanded to the Commission for further proceedings not inconsistent with this opinion.
It is so ordered.
Dtjreee, Judge; Laramore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.

 These are described in the opinions in Northern Pac. Ry. Co. v. United States, 191 Fed. 947 (C.A. 9, 1911), affirmed, 227 U.S. 355 (1913), as well as in the opinions and findings of the Indian Claims Commission below.

 Appellee’s brief states that It argued below that the Supreme Court determination was decisive and it agrees that the Commission so ruled: “The Commission’s determinations on Tracts B and D are based solely on the prior judicial settlement- of the boundary by the Supreme Court. Therefore, the only question presented for review is whether the Commission correctly deemed itself bound by the Supreme Court’s adjudication.” (P. 40.)

 There is a suggestion in the Northern Pacific record that, at least as to the southwest boundary (which Tract D involves), Government counsel may have specifically left open the possibility that the Reservation extended further (R. in No. 500, U.S. Sup. Ct., Oct. Term 1912, at p. 96).

 This line met the Yakima, the Commission thought, approximately 8 miles below.the mouth of the Satus as determined In 1885.

 Appellant says that this Berry-Lodge point was downstream from the mouth of the Satus as found by surveyor Clarke in 1885, and that if one goes downstream on the Yakima 8 miles from the Berry-Lodge point (following the general direction of the river, rather than the individual meanders) one reaches a point about two miles to the east of the present eastern end of the Reservation. From that more easterly spot, the appellant says, the boundary should go more or less directly south until it reaches the Horse Heaven Hills (at a point considerably to the east of the junction of the present boundary with the Hills).

 But it wouia be unusual for the channel to migrate upstream.

 If tie Horse Heaven Hills were to be chosen as the “divide”, there would of course be no possible way of satisfying the indication in the treaty that the divide reaches the Yakima 8 miles below the mouth of the Satus. In addition, the Hills, as extending all the way to the Yakima, can hardly be said to separate the waters of the Satus from other waters. See footnote 8, infra.

 Along a considerable part of the southern boundary of the Reservation it is correct to say that there is a divide directly separating the Satus waters from those flowing into the Columbia (in that area the latter do not flow first into the Xakima). The difficulty in interpretation arises further east (and closer to the Xakima) when the Horse Heaven Hills cease to form a direct divide between the Satus watershed and streams flowing south into the Columbia, but form, rather, a divide between waters flowing north into the Xakima east of the Satus watershed and those flowing south to the Columbia.

 Appellant errs in complaining that the Commission is inconsistent in finding appropriate (if approximate) satisfaction of the mileage factor, because (says appellant) the Commission’s line can be said to meet the Xakima some eight miles below the 1885 Clarke point only if one follows the meanders of the river, while the Commission itself rejects, at another part of its opinion, the following of meanders on the ground that the Indians would not have understood that type of measurement. But what the Commission actually rejected was not the following of the meanders but any use of mileage measurement — straight-line or by use of meanders. The Commission thought that the Indians would not have paid much attention to the mileage factor in itself and therefore minimized its importance.

 There Is a hint, in Governor Stevens’ explanation to the treaty council (on June 6, 1855) that he may have thought that the Reservation would extend much further to the east than is now claimed. He said that from the west the line would go “along the Highlands separating the Pisco and the Satass rivers from the river flowing into the Columbia, thence to the crossing of the Yakama below the main fisheries, then up the main Yakama to the Attanum where we began” (emphasis added). But these fishing sites were apparently several miles east of appellant’s claimed eastern boundary — far beyond any area claimed by the Indians now or in the past. See text accompanying note 7, supra. The usefulness of Stevens’ remark as an aid in interpretation is also diminished by the fact that the only crossings of the Yakima are within the present reserved area (far from the fishing sites to the east).

 But the Commission ruled that the present boundary errs in proceeding from the South Fork into Reservation Creek, a smaller tributary leading to South Fork. At the headwaters of the South Fork, the Commission held, the boundary should run west along the divide around the headwaters of the Klickatat River to Darling Mountain and on to Spencer’s Point where it would meet the present boundary again. This is the portion of Tract C for which the Yakima Tribe was held entitled to recover.

 In the region of Tract C, only the Ahtanum River Is named, though other unnamed streams are also shown. Neither the North or South Forks nor Nasty Creek is designated.

 In a holding which the Government does not now challenge, the Commission ran this land line by following, from the source of the South Fork, the divide between its waters and those of the Klickitat. See footnote 11, supra.

 There is no issue, on this appeal, as to the holding that the defendant is liable for taking the Cedar Valley tract; nor, as indicated above, is there any challenge to the ruling that part of Tract C was taken.

 The Commission also allowed interest from the dates of taking until entry of the final award.

 Appellee’s brief discusses at some length the detailed individual charges levied at the various findings — alleged errors of omission and of commission. We have considered the discussion in both parties’ briefs. Giving due weight (as we are required to do) to the rule of prejudicial error, we do not find any material error or omission in the findings which is likely to have affected the Commission’s conclusion. Nor do we find any error in the exclusion of the proffered comparison between the land here involved and the lands of the Klamath Indian Reservation in Oregon; the Commission did not abuse its discretion in deciding that the Klamath lands were too distant.

 Over 55% of the Cedar Valley tracts lie In Klickitat County and the remainder in Yakima County.

 The court’s decision of November 7, 1956, in Siouso Tribe was not officially reported. By order of the court, dated November 5, 1958, the appellants’ motions for new trial and to vacate the judgment of affirmance of November 7, 1956, were granted and the case was remanded to the Indian Claims Commission for further proceedings.