Davis, Judge,
delivered tbe opinion of tbe court:
Appellants seek reversal of an order of the Indian Claims Commission denying one of their claims on its merits. This demand arises out of the Treaty of August 4,1824, with the Sock and Fox Indians, I Stat. 229, under which the Indians ceded to the United States, for relatively small sums, all their rights to a very large area in Missouri — “It being understood, that the small tract of land lying between the rivers Desmoin and the Mississippi, and the section of the above line between the Mississippi and the Desmoin, is intended for the use of the half-breeds belonging to the Sock and Fox nations; they holding it, however, by the same title, and in the same manner, that other Indian titles are held.” This “small tract of land”, known as the Half-Breed Tract,[1] is the only subject of the present suit. The greater area ceded *249 under the Treaty is involved in another claim by the appellants which is still pending before the Commission. In that case the Commission determined on July 2, 1958, that the Sac and Fox Tribes aboriginally owned, at the time of the 1824 Treaty, over 1,240,000 acres in northeastern Missouri which was given over to the United States by the Treaty (6 Ind. Cl. Com. 464); the proper valuation of that area has not yet been determined by the Commission.[2] At the time it determined the ownership of the larger region the Commission put aside the issue of the Government’s liability to the Sac and Fox for the setting up of Half-Breed Tract and ruled that it was to be determined separately. That distinct question the Commission has now decided adversely to the Sac and Fox in the present proceeding, 9 Ind. Cl. Comm. 301.
Appellant’s claim is that the Half-Breed Tract, part of the land then owned by the Sac and Fox, was taken in 1824 from the Tribes, not for their benefit but for that of the United States; and accordingly that the United States is now liable under the Indian Claims Commission Act for the value of the land so taken for its benefit. The theory offered in support is that the Federal Government, anxious to obtain an easy relinquishment of the Tribe’s claims to the large Missouri region, sought to smooth the path by swaying or bribing Maurice (orMorice) Blondeau, an influential Fox half-breed who often acted as interpreter and adviser for the Tribes, through the creation of a special tract for himself and his relatives. This gift, it is said, helped make it possible for the Government to receive the larger area for very little consideration.[3]
Recognizing the difficulties of finding direct proof of this claim of fraud or unfair and less-than-honorable dealings, *250 appellants stress the inferences they draw from a number of contemporaneous documents and historical records. They say that the only reason history gives for the pilgrimage of the Sac and Fox chiefs to Washington in 1824 (when the Treaty was negotiated and signed) was to save their lands from encroachment by white settlers; [4] there is no indication of a desire to sell or cede their lands to the Government. Appellants then emphasize, as evidence of the general policy at that time of the Federal Government toward Indian lands, the instructions sent in 1818 to Lewis Cass (a treaty commissioner in another Indian matter) : “Should it be found indispensable to the formation of a treaty, on satisfactory conditions, that some lands should be ceded in fee to some few persons in the tribe, half-breeds, or others of great influence, it may be done, guarding the sales in the manner above stated. * * *”.[5] It is said that this alleged policy was carried forward, in the instance of the Sac and Fox, through the suggestion of Superintendent of Indian Affairs William Clark to the Secretary of War, in December 1823, that the reiterated claims of the Sac and Fox to the Missouri land should be quieted but that he had reasons to believe that this could be satisfactorily done without their deputation going to Washington “if authority is given to make them some presents in hand, some additions to their Annuities, and a Donation of a Section of Land to a half Indian, who has influence among the Socks.” The “half Indian” was Maurice Blon-deau — an individual previously reported in 1821 by the Indian Agent for the Sac and Fox (Thomas Forsyth) to be drunken and troublesome, but as to whom Superintendent Clark had already suggested (also in 1821) that it “would be good policy at this time, for the Government to make some provision for Morice (?) Blondow [Blondeau] a half Fox Indian of some influence among those tribes, possessing more understanding than any of the Indians * * * he wishes the government to give him in fee simple the section of Land *251 on which he has his house * * Appellants rely strongly on the fact that Superintendent Clark, who had twice made these suggestions to give land to Blondeau, negotiated and signed the Treaty of 1824 on behalf of the United States, and that Blondeau was present as an interpreter while For-syth, the friend of the Tribes, was absent.[6] The conclusion which must be drawn, we are told, is that the Indians who came to Washington to protect their lands were pressured or deceived by Clark and Blondeau into ceding, for a small price, most of their lands to the United States and the remainder to Blondeau and his relations.
If the scattered materials appellants thus nail together stood alone, they might make out a prima facie case of unfair or less-than-honorable dealings. But the other side also has its evidence and its arguments. For one thing, although Superintendent Clark had only proposed giving Blondeau the section of land on which he had his house,[7] the Treaty established an area of some 120,000 acres for all the half-breeds of the two Indian nations; this expansion of the initial suggestion could have reflected the Indians’ own desire to aid their entire half-breed group, just as in 1830 the Otoe Tribe freely made a considerable cession of its land for its half-breeds. See Otoe and Missouria Tribe of Indians v. United States, 131 Ct. Cl. 593, 626-29, 131 F. Supp. 265, 286-88 (1955), affirming 2 Ind. Cl. Comm. 335, 357-59 (1953). The face of the Treaty, moreover, suggests that the Tribes regarded Blondeau favorably; it recites that “at the request of the Chiefs of the said Sock and Fox nations” the Government was to pay Blondeau $500 in satisfaction of a debt due from the Fox to him “for property taken from him during the late war.” Appellants score this as another example of favoritism but they present no evidence, and there is no reason to believe, that the debt was nonexistent or that property had not in fact been taken from Blondeau. *252 The scanty records of the councils preceding the Treaty do not cover this provision but they do indicate that some conflict between the Sac and Fox, on the one hand, and the lowas, on the other,[8] may have been significant in the settlement ultimately accepted by the former.
The most important materials supporting the appellee came after the Treaty. They consist of documents revealing the cordiality of the Sac and Fox toward the Half-Breed Tract, their recognition that they had given it to the Half-Breeds, and their insistence that it be properly parcelled out among the donees. In 1826 the Tribes submitted to Clark a list of 38 eligible half-breeds entitled to share in the Tract. Although the United States was not required to survey the land, Clark had promised one as soon as he was authorized. In presenting the names, the chiefs referred to the lands “which we give to our relations the half breeds” by the Treaty of 1824 and stated that the list of 38 included those “to whom we give the Tract of land and to none others whatever.”[9] The same message asked Superintendent Clark “to interest yourself for our relations the half breeds of our nations who are mentioned in the above list to have their land surveyed and equally divided, it being perfectly understood at the beforementioned Treaty that the late Maurice Blondeau was to have his choice of any place in the said Tract of land so granted * * In 1829 the chiefs, again asking for a survey, stated that it was the Tribes’ intention to give “that Land” to half-breeds born at the time of the Treaty. In the same year, Keokuk, great chief of the Sac, again deplored the failure to survey the area which was reserved for the half-breeds “and their children forever and for them only.” In 1831, Congress appropriated some $2,000 for the survey; by the early part of 1833 the entire Tract had been officially surveyed. Under the Act of June 30, 1834, 4 Stat. 740, the United States specifically gave up to the half-breeds its reversionary interest in the Tract. During this period and for years thereafter, there is no record of any complaint or protest by the *253 Sac and Fox against the establishment of the Half-Breed Tract. Snch lack of protest lias been considered clear indication that no fraud had been practiced. Pottawatomie Tribe of Indians v. United States, 125 Ct. Cl. 60, 66, 111 F. Supp. 256, 259 (1953).[10]
We have set forth the opposing contentions and materials not to make our own choice but to show that the Indian Claims Commission was free, on the whole record, to adopt its findings rejecting the appellants’ claims of fraud, chicanery, duress, and dealings falling below the standards of fairness and honor. The primary issues appellants urge upon us are factual, and we need not spell out once again that the Commission’s findings of fact cannot be overridden if they are sustained by substantial evidence in the record taken as a whole. Yakima Tribe v. United States, 158 Ct. Cl. 672; Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725, 732; 281 F. 2d 202, 206, cert. denied, 366 U.S. 924. There is no doubt that the findings and conclusion in this case pass that test. They are affirmatively supported by the Treaty provisions and by the important post-Treaty statements and actions of the Tribes which can certainly be taken as showing that the Sac and Fox freely intended and desired to make a gift to their half-breeds. In the light of this evidence, the Commission could reasonably discount the inclusive pre-Treaty materials as failing to prove the taint which appellants allege.
Appellants also raise one non-evidentiary point. They insist that the Commission’s ultimate findings are open to attack because it found only that the cession of the Half-Breed Tract was for the benefit of the half-breeds, and failed to decide whether the grant was not also for the benefit of the United States (rather than the Sac and Fox). However, as we read the findings, they are consistent only with a determination that the cession was by the Indians and for their benefit, not that of the Federal Government. The Commission found that the Sac and Fox desired to provide a suitable *254 tract for their half-breeds; that “the United States did not benefit or profit” from the cession but agreed to and carried out the request of the Tribes; that the United States did not induce or request the Tribes to donate lands to the half-breeds, or exert any undue influence or pressure upon them; and that after the Treaty the Tribes restated their position that it had been their intention to give the Tract to their half-breeds. These findings add up to the very conclusion appellants say is lacking. The statement in the Commission’s opinion that “the United States created the half-breed tract at the behest of the Sac and Fox nation, not for the tribes’ benefit or the Government’s benefit, but for the sole benefit of the Sac and Fox half breeds” means only that the latter, rather than the Tribes or the Government, were to have the proprietary interest in the land; the Commission did not mean to contradict its findings or the remainder of its opinion which show that the Sac and Fox desired and requested the cession to help their own kin.[11]
The determination and findings of the Indian Claims Commission are affirmed.
Dureee, Judge; Laramore, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.

 The area is now Lee County in the State of Iowa and includes the City of Keokuk. It was about 120,000 acres in size.

 The Commission also determined that the Iowa Tribe aboriginally owned over 1,550,000 acres in northwestern Missouri ceded to the united States at the same time as the cession by the Sac and Fox. The Iowa Tribe has disclaimed any interest in the Half-Breed Tract.

 Under the Treaty, the United States was to pay $1,000 to the Sac and Fox Tribes immediately; $500 annually to each of the two Tribes for ten years; $500 to Blondeau, “it being a debt due by the said nation [Fox] to the aforesaid Blondeau, for property taken from him during the late war.” The United States also agreed to provide a blacksmith for the Tribes, to furnish them with farming utensils and cattle, and to hire men “to aid them in their agriculture” — all in the discretion of the President.

 This grievance had been expressed in a letter to the President in 1821 and was repeated in 1823.

 See Miami Tribe of Oklahoma v. United States, 146 Ct.Cl. 421, 462, 175 F. Supp. 926, 950 (1959), for the text of this instruction. In that case the court pointed out that the Government took this step reluctantly because it considered the land of great value.

 Appellants refer to various documents which, in their view, show Clark to have been most anxious to achieve the cession of the Sac and Fox lands without any great expense.
Non-Indians other than Clark and Blondeau, including at least two other interpreters, appear to have been present at the treaty councils and signing. See 7 Stat. 230.

 By 1822 Blondeau and his relations had begun to make a village in what became the Half-Breed Tract.

 See footnote 2, supra.

 There appears to have been some dispute as to the number of proper participants. The estimates vary from 38 to 101.

 The appellee also presents more-or-less contemporaneous accounts, some biased, of the cession of the Half-Breed Tract, which indicate that the Sac and Fox originally wanted to give much more land to the half-breeds but in the end had to content themselves with giving a comparatively small tract.

 In this court appellants have not properly preserved any issue as to the failure of the united States to make a timely survey and partition of the Tract. On that question the Commission found no violation of the Treaty and also held that in any event appellants lack standing to present the half-breeds’ individual claims.