**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CONFEDERATED TRIBES AND BANDS
OF THE YAKAMA NATION, a
sovereign federally recognized
Native Nation,

*Plaintiff-Appellant/
Cross-Appellee*,

v.

KLICKITAT COUNTY, a political
subdivision of the State of
Washington; KLICKITAT COUNTY
SHERIFFS OFFICE, an agency of
Klickitat County; BOB SONGER, in
his official capacity; KLICKITAT
COUNTY DEPARTMENT OF THE
PROSECUTING ATTORNEY, an agency
of Klickitat County; DAVID
QUESNEL, in his official capacity,

*Defendants-Appellees/
Cross-Appellants.*

Nos.   19-35807
19-35821

D.C. No.
1:17-cv-03192-
TOR

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued and Submitted November 20, 2020
Seattle, Washington

Filed June 11, 2021

Before:  Ronald M. Gould and Michelle T. Friedland, Circuit Judges, and Jill A. Otake,[*] District Judge.

Opinion by Judge Friedland

**SUMMARY**[**]

**Tribal Reservation**

Affirming the district court's judgment entered following a bench trial, the panel held that under an 1855 treaty between the Confederated Tribes and Bands of the Yakama Nation and the United States, the Yakama Reservation includes a tract, known as Tract D, that partially overlaps with Klickitat County, Washington.

The parties' dispute arose when the County attempted to prosecute P.T.S., a minor and enrolled member of the Tribe, for acts that occurred within Tract D.  Pursuant to a proclamation issued by the Governor of Washington, the Yakamas and the federal government share exclusive jurisdiction over certain criminal and civil offenses that occur on Reservation lands.  The Yakamas sued the County and County officials, seeking declaratory and injunctive relief barring the County from exercising criminal

---

[*] The Honorable Jill A. Otake, United States District Judge for the District of Hawaii, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

jurisdiction over Tribe members for offenses that arise within the Reservation's borders, including within Tract D. The County opposed the suit, arguing that Tract D is not part of the Reservation. The district court issued a declaratory judgment in favor of the Yakamas.

The panel held that the district court did not clearly err in its factual finding that no "spur" between the waters of the Klickatat and Pisco Rivers exists south of Mount Adams, which meant that the Treaty was ambiguous in its description of the Reservation's southwestern boundary. The district court also did not clearly err in its factual finding that the Yakamas would have naturally understood the Treaty to include Tract D within the Reservation.

Reviewing the Treaty's meaning de novo, the panel applied the Indian canon of construction, which dictates that treaty terms must be construed in the sense in which they would naturally be understood by the Indians and any ambiguities are to be resolved in their favor. The panel held that under this canon, the Treaty's ambiguity must be resolved according to the Yakamas' understanding that Tract D was included within the Yakama Reservation. The panel therefore agreed with the district court's interpretation that the Treaty included Tract D within the Reservation.

The panel further held that Congress did not alter the Reservation's southwestern boundary by statute in 1904 because Congress did not clearly express an intent to abrogate the Treaty in the 1904 Act.

**COUNSEL**

Ethan Jones (argued), Shona M. Voelckers, and Derek Red Arrow Frank, Yakama Nation Office of Legal Counsel, Yakima, Washington; Anthony S. Broadman and Robert J. Sexton, Galanda Broadman PLLC, Seattle, Washington; for Plaintiff-Appellant/Cross-Appellee.

Rylan Weythman (argued), Foster Garvey PC, Seattle, Washington; Pamela B. Loginsky, Klickitat County Special Deputy Prosecuting Attorney, Olympia, Washington; for Defendants-Appellees/Cross-Appellants.

Eric Grant, Deputy Assistant Attorney General; Rachel E. Heron, Daron Carreiro, and Christine W. Ennis, Attorneys; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Mary Anne Kenworthy and Jay W. Fields, Attorneys, United States Department of the Interior, Washington, D.C.; for Amicus Curiae United States.

Colette Routel, Mitchell Hamline School of Law, Saint Paul, Minnesota, for Amicus Curiae National Congress of American Indians Fund.

**OPINION**

FRIEDLAND, Circuit Judge:

This case concerns a boundary dispute between Klickitat County, Washington and the Confederated Tribes and Bands of the Yakama Nation (the "Yakamas" or the "Tribe"). Following a bench trial, the district court held that the Yakama Reservation includes a 121,465.69-acre tract ("Tract D") that partially overlaps with Klickitat County. We affirm.

I.

A.

In 1855, the United States negotiated a treaty with the Yakamas under which the Tribe gave up ten million acres of land in exchange for certain rights, including the right to a reservation for the Tribe's exclusive use and benefit. Treaty with the Yakamas, U.S.-Yakama Nation, arts. I & II, June 9, 1855, 12 Stat. 951; *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1007 (2019). At the Treaty negotiations, the Yakamas spoke no English and lacked familiarity with cartographic concepts such as latitude and longitude. It was therefore important for the negotiators to define the Reservation's boundaries according to natural features and to describe them through verbal and visual representations. This approach is reflected in the Treaty text, the Treaty minutes, and the Treaty map.

The Treaty text defines the Reservation's boundaries as follows (with the southwestern boundary's definition—the subject of this case—in bold):

> Commencing on the Yakama River, at the mouth of the Attah-nam River; thence westerly along said Attah-nam River to the forks; thence along the southern tributary to the Cascade Mountains; **thence southerly along the main ridge of said mountains, passing south and east of Mount Adams, to the spur whence flows the waters of the Klickatat and Pisco rivers; thence down said spur to the divide between the waters of said rivers; thence along said divide to the divide separating the waters of the Satass River from those flowing into the Columbia River**; thence along said divide to the main Yakama, eight miles below the mouth of the Satass River; and thence up the Yakama River to the place of beginning.

Treaty with the Yakamas, 12 Stat. at 952 (emphasis added).

The Treaty minutes indicate that U.S. negotiators, led by Isaac Stevens, Governor of the Territory of Washington, told the Yakamas that the Reservation would extend "to the [C]ascade mountains, thence down the main chain of the Cascade mountains south of Mount Adams, thence along the Highlands separating the Pisco and the Sattass river from the rivers flowing into the Columbia."[1]

---

[1] The primary sources spell the names of the rivers in different ways, and some of the rivers' names have also evolved over time. For instance, "Satass" is sometimes spelled as "Sattass," and the "Pisco River" is now known as "Toppenish Creek." We refer to the rivers by the names used in the Treaty text except when quoting original sources that used different names.

The relevant portion of the Treaty map depicts the Reservation's boundaries with a thin line of alternating dots and dashes.[2]



The map includes natural landmarks such as the Cascade Mountains, Mount Adams, and the White Salmon, Klickitat, and Pisco rivers.  As depicted on the map, the Reservation's northern boundary follows the Attah-nam River, its western

---

**2** This image was cropped from a digital image of a 1939 reproduction of the full Treaty map.  The full 1939 reproduction of the Treaty map appears in an appendix to this opinion.

boundary intersects with the Cascade Mountains, and its southern boundary runs south of Mount Adams.

Despite the Treaty parties' efforts to reach a mutual understanding of the Reservation's boundaries, conflicts arose almost immediately. The Treaty map disappeared soon after the Treaty was signed, making it harder to resolve those disputes. A century-long effort to determine the southwestern boundary ensued.

The earliest federal surveys, conducted without the benefit of the Treaty map, failed to resolve disagreements about the Reservation's boundaries. The first survey (the "Schwartz survey"), completed in 1890, omitted almost half a million acres that the Yakamas understood to be part of the Reservation, including land where they lived and harvested resources. This sparked outrage within the Tribe, which consequently refused to acquiesce in federal activities in the area. A federal report by E.C. Barnard in 1900 (the "Barnard report") and a survey by Charles Pecore in 1926 followed. The Barnard and Pecore investigations placed hundreds of thousands of acres within the Reservation that the Yakamas thought Schwartz had wrongly omitted, but they nevertheless prolonged the boundary dispute: Each investigator proposed a boundary that followed straight lines instead of the natural features described in the Treaty text, and even those straight lines differed. The surveyors' approach appeared to stem from the fact that, according to Barnard, "there [was] no possible way of making the wording of the [T]reaty agree with the topography of the country." Yakima Indian Reservation, H.R. Doc. No. 56-621, at 8 (1900).

Around 1930—seventy-five years after the Treaty's signing—an employee in the federal Office of Indian Affairs found that the Treaty map had been mistakenly filed under

"M" for Montana in the government's records. The United States ordered yet another survey in response to the discovery. Completed in 1932 with the benefit of the map, a survey by cadastral engineer Elmer Calvin (the "Calvin survey") included the land currently in dispute, later called "Tract D," within the Reservation for the first time. Calvin echoed Barnard's confusion in noting that the "language of the [T]reaty fails to fit the topography on the ground," but he determined that the best reading of the Treaty and the map together would include Tract D within the Reservation.

The Department of the Interior accepted the Calvin survey's conclusions, and in 1939, the Secretary of the Interior informed Congress that the Yakamas' claims to Tract D were meritorious.[3]  But some federal agencies did not adopt the Department of the Interior's position; the Attorney General, for instance, rejected the Calvin survey and maintained that the Yakamas had no viable claim to Tract D.  In 1949, the Yakamas filed a petition with the newly created Indian Claims Commission ("ICC"), which was responsible for adjudicating claims by tribes against the United States.  After seventeen years of litigation, the ICC concluded that the Treaty parties had originally intended to include Tract D within the Reservation.  *Yakima Tribe v. United States*, 16 Ind. Cl. Comm. 536, 560–64 (1966).[4]  The

---

[3] *See Yakima Indians Jurisdictional Act: Hearing on H.R. 2390 Before the Spec. Subcomm. of the H. Comm. on Indian Affs.*, 76th Cong. 3 (1939) (statement of Harold L. Ickes, Secretary of the Interior) ("As a result of an exhaustive study, extending over a period of years, this Department has heretofore concluded that the boundary claims of the Yakima Indians are meritorious.").

[4] The United States and the Yakamas then settled the Tribe's claim for compensation for the loss of title to lands within Tract D that the United States had patented to non-Indians.  And, in 1972, President

federal government considers itself bound by the effect of the ICC's decision, so federal agencies have treated Tract D as part of the Yakama Reservation ever since.

The United States ultimately approved a survey in 1982 that included Tract D within the Reservation. The federal government continues to treat the 1982 survey as the definitive survey of the Reservation's southwestern boundary.

B.

The present dispute between the Yakamas and Klickitat County arose when the County attempted to prosecute P.T.S., a minor and enrolled Yakama member, for acts that occurred within Tract D. Pursuant to a proclamation issued by Washington Governor Jay Inslee in 2014, the Yakamas and the federal government share exclusive jurisdiction over certain criminal and civil offenses that occur on Reservation lands, including juvenile delinquency offenses.[5] Citing that

---

Nixon issued an Executive Order that returned more than 21,000 acres of national forest lands within Tract D to the Yakamas. *See* Exec. Order No. 11,670, 3 C.F.R. 708 (1971–75).

[5]    Wash. Proclamation 14-01 (Jan. 17, 2014), https://www.governor.wa.gov/sites/default/files/proclamations/proc_14 -01.pdf. A federal statute enacted in 1953, known as "Public Law 280," allowed states to assume jurisdiction over some crimes and civil causes of action on Indian reservations, but in 1968, Congress enacted another statute that allowed states to give such jurisdiction back through a process known as "retrocession." *See Confederated Tribes & Bands of the Yakama Nation v. Yakima County*, 963 F.3d 982, 985–86 (9th Cir. 2020), *cert. denied*, — S. Ct. —, 2021 WL 1240924 (2021) (citing Act of Aug. 15, 1953, Pub. L. 83-280, 67 Stat. 588 (1953) and Act of Apr. 11, 1968, Pub. L. 90-284, 82 Stat. 79 (1968) (codified at 25 U.S.C. § 1323)). Washington initially assumed jurisdiction over some crimes

proclamation, the Yakamas contended that Klickitat County lacked jurisdiction to prosecute P.T.S. for an incident that took place within Tract D.  The Yakamas sued Klickitat County and several County officials (collectively "the County"), seeking declaratory and injunctive relief barring the County from exercising criminal jurisdiction over Tribe members for offenses that arise within the Reservation's borders, including within Tract D.  The County opposed the suit, arguing that Tract D is not part of the Reservation.[6]

Following a three-day bench trial, the district court issued a declaratory judgment in favor of the Yakamas.  The court observed that the Treaty's description of the southwestern boundary is ambiguous because some of the natural features it references do not exist.  But the court found that the Yakamas would have understood the Treaty to include Tract D within the Reservation at the time of the Treaty negotiations.  In so finding, the district court credited

---

and civil causes of action occurring on the Yakama Reservation, *id.* at 985, but in 2012, through a process established by the state, the Yakamas filed a petition for full "retrocession of both civil and criminal jurisdiction on all Yakama Nation Indian country." *Id.* at 986.  Governor Inslee's proclamation granted the Yakamas' request "in part," including by retroceding "full civil and criminal jurisdiction [over] . . . Compulsory School Attendance; Public Assistance; Domestic Relations; and Juvenile Delinquency." *Id.* (citation omitted).

[6] The parties also disputed the types of criminal matters over which the County has jurisdiction on Reservation lands under the Governor's proclamation.  The parties now agree that we are bound by our court's intervening decision in *Confederated Tribes & Bands of the Yakama Nation v. Yakima County*, 963 F.3d 982 (9th Cir. 2020), *cert. denied*, — S. Ct. —, 2021 WL 1240924 (2021), which resolved the types of criminal matters that fall within the County's jurisdiction on Reservation lands, *id.* at 982.  For example, the parties agree that the County would have jurisdiction over juvenile offenses involving Yakama members taking place within Tract D only if Tract D was not Reservation land.

the Yakamas' expert's testimony and rejected the County's, explaining that the County's expert's "analysis [was] flawed and ignore[d] important historical events and critical pieces of evidence."   The court accordingly held that the Treaty with the Yakamas included Tract D as part of the Reservation, and that the survey approved by the United States in 1982 "marks the correct southwestern boundary."

The County timely appealed.

## II.

We evaluate the district court's conclusions in this case in two steps.   First, we review for clear error the district court's "[u]nderlying factual findings," including those related to topography and history.  *Cree v. Flores*, 157 F.3d 762, 768 (9th Cir. 1998).   We will not overturn those findings unless we reach a "'definite and firm conviction' that a mistake has been committed."  *United States v. Washington*, 157 F.3d 630, 648 (9th Cir. 1998) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 346 n.14 (1992)).   Second, we "review de novo whether the district court reached the proper conclusion as to the meaning of the [Treaty] given those findings."  *Id.* at 642.

In our de novo review, we must give due weight to the Indian canon of construction, which dictates that treaty terms must be "construed 'in the sense in which they would naturally be understood by the Indians.'"   *Herrera v. Wyoming*, 139 S. Ct. 1686, 1699 (2019) (quoting *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979)).   The Supreme Court has applied this canon to the Treaty at issue here several times, and "each time it has stressed that the language of the treaty should be understood as bearing the meaning that the Yakamas understood it to have in 1855." *Wash. State Dep't*

*of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1011 (2019).  The canon also instructs that "Indian treaties are to be interpreted liberally in favor of the Indians," and "any ambiguities are to be resolved in their favor."  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 200 (1999).

III.

A.

We thus begin by reviewing the district court's factual findings for clear error.  At the end of the bench trial, the district court issued seventeen pages of factual findings, two of which are key to our analysis and are not clearly erroneous.  First, the district court found that no "spur" between the waters of the Klickatat and Pisco Rivers exists south of Mount Adams.[7]  This finding is significant because

---

[7] Confusingly, a "spur" has sometimes been referred to as a "spur divide," including by Elmer Calvin, who completed the 1932 survey of the area with the benefit of the Treaty map.  The parties generally agree that a "spur" is higher ground extending laterally from the side of a mountain or a ridge, and a "divide" is a boundary between two watersheds.  A "spur divide," according to testimony Calvin gave in the ICC proceedings in 1950, is a "long spur that acts as both a spur and a divide."  To prevent confusion, and because the County's briefs raise distinct arguments about the Treaty's references to a "spur" and to a "divide," each of which we address separately, we avoid using the term "spur divide."

The County argues that a spur may be "discontinuous," for example if it is crossed by a river.  The Tribe disputes this, arguing that crossing a creek, stream, or river is "contrary to the definition of a spur."  We need not resolve this precise dispute because, for the other reasons set forth elsewhere in this opinion, we reject the County's broader theory that the Treaty unambiguously requires that the Reservation's southwestern boundary exclude Tract D.

the critical passage in the Treaty text describes the Reservation's southwestern boundary as "passing south and east of Mount Adams, to the *spur* whence flows the waters of the Klickatat and Pisco rivers; thence down said *spur* to the divide between the waters of said rivers; thence along said divide" to another divide separating the Satass and Columbia Rivers.  Treaty with the Yakamas, 12 Stat. at 952 (emphases added).  If the spur does not exist as described in the Treaty, then the Treaty is ambiguous in its description of the Reservation's southwestern boundary.

The County argues that this finding was erroneous, insisting that a "spur" that satisfies the Treaty call exists between the Klickatat and Pisco Rivers.  The County cites reports written by the United States' negotiator, Governor Isaac Stevens, which describe spurs that were "thrown out from the main chain" of the Cascade Mountains, "extending towards and in some cases reaching the banks of the Columbia [River]," including one "between the Klickitat and Pisko tributary of the Yakima [River]."  Relying on that description, in its appellate briefs the County reproduces for the first time a Google map of the area immediately surrounding Mount Adams, draws a line on that map that runs east from the base of the mountain, calls that line a "spur," and posits that it satisfies the Treaty call as the Treaty parties would have understood it.

The district court did not commit clear error in concluding otherwise given the lack of expert testimony supporting the location of any such spur.  When the County attempted to have its only expert testify about the purported spur's location, the district court sustained an objection from the Tribe that the witness should not be permitted to "testif[y] as to the physical features . . . that could satisfy the calls in the Treaty" because he had failed to disclose this

theory in his report. Indeed, that expert—a historian—confirmed on cross-examination that he had no expertise in geography, topography, or cartography.

Even if there had been expert testimony that supported the County's spur theory, we still would not conclude that the district court clearly erred in finding that no spur between the waters of the Klickatat and Pisco Rivers exists south of Mount Adams. The County's proffered spur conflicts with the findings of the United States' surveyors, whose expertise we owe deference.[8] The County's theory also conflicts with the ICC's conclusion that "[t]here is in fact no spur." *Yakima Tribe v. United States*, 16 Ind. Cl. Comm. 536, 560 (1966).

The second key factual finding that we review for clear error is that the Yakamas would have naturally understood the Treaty to include Tract D within the Reservation. *United States v. Confederated Tribes of Colville Indian Rsrv.*, 606 F.3d 698, 709 (9th Cir. 2010) ("We . . . review for clear error the district court's findings as to the understanding of the Native Americans present at the [treaty] negotiations."). This finding is important because it will inform our application of the canon of Indian construction, which requires that we construe ambiguous treaty terms according to the Yakamas' understanding.

The County contends that the written historical record lacks evidence that the Yakamas expressed a belief before

---

[8] The United States has submitted a brief as *amicus curiae* in support of the Yakamas. Although we are not bound by the government's interpretation of the Treaty, its approval of the 1982 survey is "necessarily a strong consideration." *N. Pac. Ry. Co. v. United States*, 227 U.S. 355, 366 (1913); *see also Cragin v. Powell*, 128 U.S. 691, 698–99 (1888) (discussing the need for courts to refrain from second-guessing public surveys).

the 1930s that Tract D was included in the Reservation. Although "[e]vidence of post-treaty activities" is relevant to discerning the Tribe's understanding of the Treaty, *Makah Indian Tribe v. Quileute Indian Tribe*, 873 F.3d 1157, 1166 (9th Cir. 2017), it is not very informative here, where the Yakama Reservation was not surveyed until thirty-five years after the Treaty agreement was reached. If the Yakamas understood the Reservation to include Tract D from the very beginning, then it is logical that they would not have known about the United States' disagreement with their understanding until at least 1890, when the Schwartz survey was conducted. By that point, according to the Yakamas' expert, the Yakamas were so outraged by Schwartz's omission of more than half a million acres from what they understood to be the Reservation that they expressed their concerns in general terms instead of highlighting specific tracts.

The district court reasonably found that the materials from the Treaty negotiations demonstrate that the Yakamas understood the Treaty to include Tract D in the Reservation, even if the Tribe did not press that understanding for several decades after the Treaty's signing.[9] For example, the district

---

[9] We also note that the Yakamas' historical expert, whose testimony was found credible by the district court, emphasized that the written record from the period after the Treaty was signed is incomplete because it lacks evidence from the Yakamas' oral history. We have long recognized the importance of oral traditions when interpreting this very Treaty. *See Cree v. Flores*, 157 F.3d 762, 773 n.11 (9th Cir. 1998) ("Were it otherwise, the history and culture of a society that relies on an oral history tradition could be brought before the fact finder only with the greatest of difficulty and probably with less reliability."). According to the Yakamas' expert, the Tribe's oral history indicates that the Yakamas consistently understood the area within Tract D to be part of the Reservation and that they challenged encroachments on that territory.

court gave significant weight to the Treaty minutes, observing that they "are the best evidence remaining of what occurred and what Governor Stevens told the Yakama Nation's representatives." It made sense for the district court to emphasize the minutes because the Yakamas depended almost entirely on oral communication to understand the Treaty's contents. According to the minutes, the Yakamas were told that the Reservation's boundary would run "down the main chain of the Cascade mountains south of Mount Adams." This suggests that the Yakamas were made to understand the boundary as running south of Mount Adams, thereby including territory directly south of the mountain within the Reservation's boundaries. Tract D meets that description. The minutes are also consistent with the map's representation of the boundary: As Department of the Interior topographic engineer F. Marion Wilkes wrote in 1933, "from [the] map it is apparent that the makers of the treaty intended to take in a large area south of [Mount] Adams," including "the area around [Tract D]."

Other evidence in the historical record further supports the district court's finding that the Yakamas understood the Treaty to include Tract D within the Reservation. *See Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999) (looking to historical evidence to "shed[] light" on how a tribe understood a treaty agreement). The Yakamas' expert testified that the Tribe valued Camas Prairie, an area located within Tract D, as a critical source of food. The expert further explained that the United States' negotiators knew about the Yakamas' interest in the prairie: Federal representatives, in an effort to protect the Yakamas' interest from encroaching settlers, recommended that Camas Prairie be reserved for the Yakamas as soon as possible because of the necessary foods the area provided, and the

likelihood that early settlers would otherwise destroy the prairie's resources.

Under the highly deferential clear error standard, we uphold the district court's findings that the spur described in the Treaty does not exist and that the Yakamas understood the Treaty to include Tract D within the Reservation's boundaries.

## B.

Proceeding to our de novo review of the Treaty's meaning, and taking the district court's factual findings as true, we further hold that the Treaty included Tract D within the Yakama Reservation. The Treaty is ambiguous in that it calls for the southwestern boundary of the Reservation to follow a natural feature south of Mount Adams that, according to the district court's findings, does not actually exist as described. Under the Indian canon of construction, the Treaty's ambiguity must be resolved according to the Yakamas' understanding that Tract D was included within the Yakama Reservation. *Wash. State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1011 (2019).

Although the County agrees that ambiguities must be resolved in favor of the Tribe, it argues that the Treaty contains unambiguous text that requires the exclusion of Tract D from the Reservation. Here, the County focuses on the term "divide" in the Treaty text. The Treaty calls for the southwestern boundary to run "south and east of Mount Adams," first to the "spur" between the Pisco and Klickatat Rivers, "thence down said spur" to the "divide" between those rivers. Treaty with the Yakamas, 12 Stat. at 952. According to the County, even if the first call is ambiguous because a spur between the Pisco and Klickatat Rivers may not exist south of Mount Adams, the second call is

unambiguous because there is a "divide" between those rivers that lies well north of Tract D. Given that the location of the Pisco-Klickitat divide is clear, the County argues, the Reservation's southwestern boundary must be interpreted to traverse it and thereby exclude Tract D.

The County's argument merely replaces one ambiguity with another. Notably, the Pisco-Klickitat divide lies north of Mount Adams. The County concedes this point, but it nonetheless argues that the Treaty's call for the boundary to traverse that divide must be honored anyway. We disagree. Critically, the Treaty text states that the boundary should run "south and east of Mount Adams, to the spur . . . thence down said spur to the divide." *Id.* The Treaty thus indicates that the southwestern boundary runs south of Mount Adams. Although accepting the County's interpretation might resolve the Treaty's ambiguity as to the relevant divide, it would create a different ambiguity by conflicting with the Treaty's description of where the boundary lies relative to Mount Adams. Because the Treaty is ambiguous either way, under the Indian canon of construction, we must resolve the ambiguity in favor of the Yakamas.[10]

---

[10] The County's spur argument, *see supra* section III.A, suffers from a similar problem under the Indian canon of construction. The County asserts that "spur" unambiguously refers to the line it drew on its Google map, which it says represents a "large, discontinuous ridge" that should be considered a spur. In support of its position, the County relies on writings and maps used by Governor Stevens. At most, the County's evidence supports a determination that the term "spur" is ambiguous because it is not defined in the Treaty text. But Stevens used the materials cited by the County for purposes unrelated to the Treaty, and the Yakamas probably never saw them. Under the Indian canon of construction, Stevens' materials provide limited value for interpreting

Furthermore, the Supreme Court has already rejected an argument similar to the County's argument about the Pisco-Klickatat divide.  In *Northern Pacific Railway Co. v. United States*, 227 U.S. 355 (1913), the Court considered another question about the Reservation's boundaries, which arose in the context of a dispute about whether the United States had appropriately granted land patents to a railroad company.  In addressing the parties' arguments there, the Court rejected the Schwartz survey for placing too much emphasis on the Pisco-Klickatat divide.  *See id.* at 362.  The Court suggested that the proper approach would be to try to give effect to all of the Treaty calls based on a "consideration of the topography of the country and the testimony" available.  *Id.* In light of this instruction, we must reject the County's contention that the Pisco-Klickatat divide alone determines the location of the Reservation's southwestern boundary.

Fundamentally, the County's argument is that there can only be one way to understand this Treaty, and that the one

---

this potentially ambiguous term because we must construe the Treaty liberally in favor of the Yakamas' understanding at the time.

And even if we were to compare Stevens' writings and maps to present day maps in an effort to locate the spur, we would need to do so with skepticism.  In its thorough consideration of the Yakama Reservation's southwestern boundary, the ICC concluded that a map prepared at Stevens' direction just two years after the Treaty negotiations—and which he vouched for as accurate—had "many inaccuracies." *Yakima Tribe v. United States*, 16 Ind. Cl. Comm. 536, 562 (1966).  Apparently, Stevens' map was so inaccurate that the ICC felt compelled to "confess" that "[the map] is disturbing to us in our consideration of this case." *Id.* at 561.  The Treaty map was also prepared at Stevens' direction.  Although the Treaty map does not accurately depict the topography of the area either, it is relevant because it represents what the Yakamas saw and were made to understand, whereas Stevens' other maps offer no such value.

correct understanding of the Treaty is different from the ICC's determination and from the conclusions of all federal surveys since the rediscovery of the map.  Any such argument is at the very least an uphill climb.

For all of these reasons, we conclude that the Treaty language is inherently ambiguous.  Consequently, in light of the Indian canon of construction, we agree with the district court's interpretation that the Treaty included Tract D within the Reservation.

## IV.

Next, we must consider the County's argument that even if the Treaty originally included Tract D within the Yakama Reservation, Congress altered the Reservation's southwestern boundary by statute in 1904 and excluded Tract D.  Although Congress may change reservation boundaries by statute, "[i]f Congress seeks to abrogate treaty rights, 'it must clearly express its intent to do so.'" *Herrera v. Wyoming*, 139 S. Ct. 1686, 1698 (2019) (quoting *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999)).  We hold that Congress did not clearly express an intent to abrogate the Treaty, so we reject the County's contention.

At the turn of the twentieth century, Congress faced growing pressure to open established reservation lands to "waves of homesteaders moving West." *Solem v. Bartlett*, 465 U.S. 463, 466 (1984).  In response, "Congress passed a series of surplus land acts . . . to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement." *Id.* at 466–67.  Congress began enacting surplus land acts around the same time that the Yakamas learned that the first official survey of the Reservation's boundary—the Schwartz

survey—had found the Reservation to be much smaller than the Yakamas understood.  Upon learning of Schwartz's findings, the Yakamas refused to acquiesce in any sales of surplus Reservation lands and demanded that the United States commission another survey.

In 1904, Congress enacted legislation that authorized selling Yakama Reservation lands without the need to obtain the Yakamas' consent.  *See* Act of Dec. 21, 1904, ch. 22, 33 Stat. 595 (1904) ("the 1904 Act").  To mollify the Yakamas, Congress included language in the 1904 Act instructing the Secretary of the Interior to recognize a second investigation—the Barnard report—that included nearly 300,000 more acres within the Reservation's boundaries than the Schwartz survey had.  *Id.* § 1, 33 Stat. at 596. Neither Schwartz nor Barnard included Tract D within the Reservation's boundaries.

The 1904 Act recognized the Barnard report "for the purposes of this act."  *Id.*  In another section, the 1904 Act stated that "the purpose of this Act [is] merely to have the United States to act as trustee for said Indians in the disposition and sales of said lands and to expend . . . to them the proceeds."  *Id.* § 7, 33 Stat. at 598.

The County argues that the 1904 Act reflects Congress's clear intent to rely on the Barnard report to determine the Yakama Reservation's southwestern boundary.  In addition to the statute's text, the County points to congressional committee reports, which explain that "[f]or many years the Indians have claimed that the boundary lines of said reservation as laid out are incorrect and that their reservation includes more lands than have been embraced within the recognized limits of their reservation" and that "[t]his bill proposes to recognize the validity of the claim to the tract of land adjoining the reservation to the extent of" nearly

300,000 additional acres. H.R. Rep. No. 58-2346, at 2 (1904); S. Rep. No. 58-2738, at 1–2 (1904). Although neither the statute nor these legislative materials mention Tract D, the County asks us to interpret the 1904 Act as abrogating the Yakamas' right to it.

Applying the Indian canon of construction, we decline to infer from the 1904 Act a congressional intent to exclude Tract D from the Yakama Reservation. Nothing in the Act itself or the legislative history suggests that Congress even contemplated Tract D. And, between the surveys Congress did consider, it chose the one that gave the Yakamas more land, not less. The Act therefore lacks "clear evidence that Congress *actually considered* the conflict between its intended action on the one hand" and the Yakamas' right to Tract D on the other, and that it "chose to resolve that conflict by abrogating the treaty" to take Tract D away from the Yakamas. *Herrera*, 139 S. Ct. at 1698 (emphasis added) (quoting *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 202–03).

The Supreme Court's reasoning in *Northern Pacific Railway Co. v. United States*, 227 U.S. 355 (1913), comports with this conclusion. There, the Court recognized the existence of the 1904 Act, but it did not hold that the Act conclusively settled the Reservation's boundaries. *N. Pac. Ry. Co.*, 227 U.S. at 358, 367. Instead, the Court analyzed the Treaty text to determine whether the Schwartz survey or the Barnard report better adhered to the Treaty negotiators' intentions. *Id.* at 357–58. This suggests that the 1904 Act did not supersede the Treaty's establishment of the southwestern boundary.

The United States' and Congress's subsequent conduct is also consistent with our understanding of the 1904 Act. *See Alaska Pac. Fisheries Co. v. United States*, 248 U.S. 78,

89–90 (1918) (supporting the conclusion that Congress intended to include submerged lands within an Indian reservation with evidence of the Department of the Interior's subsequent conduct); *United States v. Idaho*, 210 F.3d 1067, 1078–79 & n.17 (9th Cir. 2000) (citing Congress's actions after Idaho's statehood as evidence supporting Congress's "pre-statehood intent" to recognize submerged lands as within a reservation).  Two years after the Treaty map was rediscovered, the Calvin survey concluded that the Reservation's boundaries included Tract D.  The Secretary of the Interior accepted Calvin's conclusions—even though they were made decades after Congress enacted the 1904 Act—and then informed Congress that the Yakamas' claims to Tract D were meritorious.  In 1939, Congress appropriated funds "[f]or completion of a survey of the disputed boundary of the Yakima Reservation, Washington."  Act of May 10, 1939, ch. 119, 53 Stat. 685, 696.  These actions would not have been necessary if Congress had redefined the Reservation's boundary by statute in 1904.

We accordingly hold that Congress did not conclusively exclude Tract D from the Reservation through the 1904 Act.[11]

---

[11] The Yakamas argue that we should apply the "diminishment" framework to determine the effect of the 1904 Act on the Reservation's boundaries.  Courts use that framework to resolve disputes over whether Congress "diminished" reservations by opening unallotted reservation lands to non-Indian settlement. *Solem*, 465 U.S. at 467.  We do not apply that framework here because the 1904 Act did not open Tract D for settlement.  Even if the diminishment framework did apply, it would require the County to demonstrate a clear congressional intent to remove Tract D from the Yakama Reservation through the 1904 Act. *See id.* at 470; *cf. McGirt v. Oklahoma*, 140 S. Ct. 2452, 2463 (2020) (holding that the disestablishment of a reservation, like diminishment, "require[s] that

## V.

For the foregoing reasons, we **AFFIRM** the district court's holding that Tract D is within the Yakama Reservation.

---

Congress clearly express its intent to do so," typically with "reference[s] to cession or other language evidencing the present and total surrender of all tribal interests" (quoting *Nebraska v. Parker*, 577 U.S. 481, 488 (2016))).  As we have explained, the County has failed to make such a demonstration.

APPENDIX

